# United States Court of Appeals
## for the Eighth Circuit

———————————————————————

No. 19-2536

———————————————————————

Gary W. Miller,

*Plaintiff - Appellant*

v.

Union Pacific Railroad Company,

*Defendant - Appellee*

——————————

Appeal from the United States District Court
for the District of Nebraska- Omaha

——————————

Submitted: May 12, 2020
Filed: August 26, 2020

——————————

Before COLLOTON and BENTON, Circuit Judges, and WILLIAMS,[1] District Judge.

——————————

WILLIAMS, District Judge.

Gary W. Miller sustained injuries while serving as an engineer for Union Pacific Railroad Company (UP) when the train he was operating partially derailed

---

[1]The Honorable C.J. Williams, United States District Judge for the Northern District of Iowa, sitting by designation.

because a misaligned switch sent the train onto an unused siding track.  Miller brought suit seeking compensation under the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51 et seq., asserting FELA negligence per se and negligence claims.  Specifically, in his negligence per se claim, Miller alleged UP failed to comply with federal regulations requiring it to align the switch for mainline movement.  In his negligence claim, Miller alleged UP was negligent by failing to align the switch for mainline movement, properly secure switch keys to prevent a third party from changing the switch, install additional or different devices to lock the switch in place, or remove the switch when UP stopped using the siding track.  Miller appeals the district court's[2] order denying his motion for partial summary judgment and granting UP's motion for summary judgment.  We affirm.

I.

At about 8:00 p.m., on September 20, 2015, Miller and a conductor were operating a train from Oklahoma City to Enid, Oklahoma along a mainline track. Near Enid was a switch that could divert a train from the mainline track to a siding track.  UP had not used the siding track for about ten years and generally had not maintained the siding track.  The siding track was short and there was a ravine past the end of the track.  The siding track was not intended for high speeds.

Federal Railroad Administration (FRA) regulation 49 C.F.R. § 218.105 requires railroads to adopt policies designating the default position for switches.  In compliance with this regulation, UP adopted an operating rule requiring switches to be lined for mainline travel when not in use.  FRA regulations also require railroad switches to have reflectorized "switch targets" that tell the train crew whether a switch is lined for mainline travel or onto a siding track.  A green square indicates the

_____

[2]The Honorable Laurie Smith Camp, United States District Judge for the District of Nebraska.

-2-

switch is lined for mainline travel, and a red circle with a silver stripe indicates that the switch is lined for the siding track.

As the train neared Enid and was about 1,500 feet from the switch, Miller noticed the small silver stripe on the switch indicator. When Miller realized the switch was lined toward the siding track, he activated various braking mechanisms. The event data recorder for the train shows that Miller began braking just more than 800 feet from the switch. The train continued down the track and when the train was about 500 feet from the switch Miller could first see part of the red target. The lead locomotive went through the switch onto the siding track. The second locomotive derailed and pulled the lead locomotive to a stop. The remaining cars piled up near the switch. Miller was injured in the incident.

UP had inspected the switch just days before the accident, on both September 15 and 18, 2015, finding it aligned for mainline movement. The switch was secured by a standard switch lock that could be unlocked with a universal "102 key." These 102 keys worked on numerous UP switches and were distributed to various UP employees. Amtrak employees also had access to 102 keys. Those two inspections also showed the switch was spiked and anchored to prevent the switch from being misaligned to the unused siding track. The day before the accident, another train passed over the switch on the mainline without incident. Between that train's passage and the accident, there was no evidence that any UP employees were at the switch location within the scope of their duties.

After the accident, UP inspected the switch again. This time the switch was partially lined to the siding track but was not latched in that position. Someone had used a 102 key to unlock the switch. At some point before September 20, 2015, there was a burglary of an Amtrak building in nearby Oklahoma City, and a number of 102 keys were stolen. The side of the lock looked like it had recently been "beat on."

Locks that have not been opened for a while can be difficult to open, and sometimes it is necessary to strike the side of locks to get keys to work.

UP contacted the authorities, and Special Agent Scott Bybee ("Bybee") of the Railroad Police Department investigated the incident. In addition to the marks on the lock, Bybee also noted that the spikes and rail anchors holding the switch in place had been removed and were left near the switch. Bybee believed that the derailment was the result of a criminal act.

In granting summary judgment in UP's favor, the district court concluded that a third party, not UP, had misaligned the switch causing the accident. The district court found that UP was not negligent per se because Miller could not prove UP violated the switch position regulation when it did not know or should have known that the switch had become misaligned. The district court also found that even if UP violated the regulation, its violation was excused because it exercised reasonable care to comply with the regulation. As to Miller's negligence claim, the district court found that Miller failed to produce facts raising a genuine issue for trial about whether UP breached a general duty of care.

## II.

This Court reviews a grant of summary judgment de novo. *See Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). "Summary judgment should be granted when—viewing the facts most favorably to the nonmoving party and giving that party the benefit of all reasonable inferences—the record shows that there is no genuine issue of material fact." *Schilf v. Eli Lilly & Co.*, 687 F.3d 947, 948 (8th Cir. 2012) (citing FED. R. CIV. P. 56(c)). "At summary judgment, the court's function is not to weigh the evidence and determine the truth of the matter itself, but to determine whether there is a genuine issue for trial." *Id.* at 949 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "There is a

genuine dispute when the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1061 (8th Cir. 2016) (citation and internal quotation marks omitted); *see also Odom v. Kaizer*, 864 F.3d 920, 921 (8th Cir. 2017) (reviewing grant of summary judgment de novo; summary judgment is proper when there is no genuine issue of material fact and party is entitled to judgment as a matter of law; evidence is viewed and all reasonable inferences are drawn in nonmoving party's favor). In summary judgment, however, "[t]he nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Torgerson*, 643 F.3d at 1042 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).

## III.

Enacted in 1908, FELA provides railroad employees with a federal cause of action for injuries. FELA states, in relevant part:

> Every common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier[.]

45 U.S.C. § 51. FELA imposes upon employers a continuous duty to provide a reasonably safe place to work. *Cowden v. BNSF Ry. Co.*, 690 F.3d 884, 889 (8th Cir. 2012). "Cognizant of the physical dangers of railroading that resulted in the death or maiming of thousands of workers every year, Congress crafted a federal remedy that shifted part of the 'human overhead' of doing business from employees to their employers." *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 542 (1994) (quoting *Tiller v. Atl. Coast Line R.R. Co.*, 318 U.S. 54, 58 (1943)). "In order to further FELA's humanitarian purposes," Congress removed various common-law obstacles

to an employee's recovery, *id.*, and courts have "liberally construed FELA to further Congress'[s] remedial goal," *id.* at 543. Nevertheless, "although common-law principles are not necessarily dispositive of questions arising under FELA, unless they are expressly rejected in the text of the statute, they are entitled to great weight in our analysis." *Id.* at 544.

"Under the FELA, '[a] railroad will be liable if its or its agent's negligence played any part, *even the slightest*, in producing the employee's injury.'" *Ybarra v. Burlington Northern, Inc.*, 689 F.2d 147, 149 (8th Cir. 1982) (quoting *Richardson v. Mo. Pac. R.R. Co.*, 677 F.2d 663, 665 (8th Cir. 1982) (emphasis in original)). "FELA's language on causation . . . 'is as broad as could be framed.'" *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 691 (2011) (quoting *Urie v. Thompson*, 337 U.S. 163, 181 (1949)); *see also Fletcher v. Union Pac. R.R. Co.*, 621 F.2d 902, 909 (8th Cir.1980) ("The test of causation under the FELA is whether the railroad's negligence played any part, however small, in the injury which is the subject of the suit."). "That FELA is to be liberally construed, however, does not mean that it is a workers' compensation statute." *Gottshall*, 512 U.S. at 543. The basis of liability remains "negligence, not the fact that injuries occur." *Id.* (quoting *Ellis v. Union Pac. R.R. Co.*, 329 U.S. 649, 653 (1947)).

Under FELA, an employer's "fault may consist of a breach of the duty of care . . . or of a breach of some statutory duty." *Kernan v. Am. Dredging Co.*, 355 U.S. 426, 432 (1958). If a plaintiff proves a railroad violated a statutory duty, then the plaintiff need not prove the common law elements of foreseeability, duty, or breach. *Edwards v. CSX Transp. Inc.*, 821 F.3d 758, 760 (6th Cir. 2016). Moreover, a violation of a safety statute "creates liability under FELA . . .without regard to whether the injury flowing from the breach was the injury the statute sought to prevent." *Kernan*, 355 U.S. at 433. Thus, "a railroad's violation of a safety statute . . . is negligence per se." *McBride*, 564 U.S. at 703 n.12.

Under the Federal Railroad Safety Act (FRSA), 49 U.S.C. §§ 20101, et seq., the Secretary of Transportation delegated to the FRA the responsibility of prescribing regulations for the operation of railroads. One such regulation at issue here addressed the designation of switch positions. It provides, in relevant part:

> (a) Each railroad shall adopt and comply with an operating rule which complies with the requirements of this section. When any person including, but not limited to, each railroad, railroad officer, supervisor, and employee violates any requirement of an operating rule which complies with the requirements of this section, that person shall be considered to have violated the requirements of this section.
>
> (b) Designating switch position. The normal position of a hand-operated main track switch shall be designated by the railroad in writing and the switch shall be lined and locked in that position when not in use except when:
>
> > (1) The train dispatcher directs otherwise with respect to the position of a hand-operated main track switch and the necessary protection is provided; or
>
> > (2) The hand-operated switch is left in the charge of a crewmember of another train, a switchtender, or a roadway worker in charge.

49 C.F.R. § 218.105. A separate regulation requires railroads to inspect "each switch . . . at least monthly." 49 C.F.R. § 213.235.

IV.

Miller alleges UP was negligent per se for violating the regulation requiring that the main track switch be lined and locked for main line movement per UP's policy. The relevant portions of Section 218.105 require two things of railroads: 1) adopt a written operating rule designating the normal position of a hand-operating

-7-

main track switch; and 2) line and lock the switch in that position when it is not in use. Here, there is no question that UP adopted a written operating rule that switches be lined and locked for mainline movement when not in use. The question is whether UP complied with the rule by lining and locking the switch for mainline movement. There is no doubt that UP did line and lock the switch for mainline movement, and beyond that inspected the switch twice within days of the accident to ensure its proper alignment. There is also no doubt that, at the time of the accident, the switch was no longer lined and locked for mainline movement.

Miller posits that the fact the switch was not aligned for mainline movement at the time of the accident means UP failed to comply with Section 218.105. In short, Miller would have UP be strictly liable for any injuries resulting from the state of the switch, no matter who was responsible for the state of the switch. Throughout his briefing, Miller conflates "strict liability" with "negligence per se." That argument is not consistent with FELA, which is not a strict liability statute. *See Gottshall*, 512 U.S. at 543. Nor is it consistent with the plain language of Section 218.105, which imposes liability when any person, including any railroad, violates the rule. *See* 49 C.F.R. § 218.105(a) (assigning fault to "that person" who "violates any requirement of an operating rule which complies with the requirements of this section"). Liability lies, then, with the actor responsible for the violation—the person who caused the switch not to be aligned as designated. Thus, for UP to be liable, Miller would need to show that UP caused the switch to be moved out of its designated position.

*Edwards*, a Sixth Circuit case, is instructive. *See Edwards*, 821 F.3d at 762. There, plaintiff suffered injury because of an unsanitary bathroom in a lead locomotive. *Id.* He sued under FELA, alleging negligence per se and arguing that the railroad violated a regulation that stated that the "sanitation compartment of each lead locomotive in use *shall* be sanitary." *Id.* (citing 49 C.F.R. § 229.139(a) (emphasis added)). A different regulation required the railroad to inspect each sanitation compartment daily. *Id.* (citing 49 C.F.R. § 229.21). The facts were

uncontested that the bathroom was unsanitary at the time of plaintiff's accident, and that the railroad had cleaned the bathroom less than 24 hours prior. *Id.* at 759–60. The court rejected plaintiff's argument, ruling that it "reads too much into [the regulation] and too little into the context in which it appears." *Id.* The court read the two regulations together to require sanitary conditions at the time of daily inspection, instead of creating a regulatory scheme "creat[ing] a 24/7 strict liability duty—one that, as the district court pointed out, would require a full-time bathroom supervisor." *Id.*; *see also Maracich v. Spears*, 570 U.S. 48, 68 (2013) (citing A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 180 (2012) ("The provisions of a text should be interpreted in a way that renders them compatible, not contradictory.")). This case is analogous. A different regulation requires railroads to inspect each switch monthly. *See* 49 C.F.R. § 213.235(a). Section 213.235 and Section 218.105 should be read as compatible, so that a railroad must inspect each switch monthly and it must not cause a switch to be not aligned as designated. To do otherwise, as Miller contends, would nullify the monthly inspection requirement and require a "full-time" supervisor for every switch. *See Edwards*, 821 F.3d at 762.

Here, Miller did not present any evidence that would raise a genuine issue of material fact that UP "played any part, even the slightest" to cause the switch to be moved from its designated position. *See Ybarra*, 689 F.2d at 149. Rather, the evidence showed the switch was misaligned by a criminal act of a third party. The evidence showed that someone had tampered with the lock and other safety devices to change the switch. A UP employee inspected the switch only two days before the accident and found it locked in proper alignment. Plaintiff offered evidence that at some unspecified time UP used the siding for storing equipment during maintenance. There was, however, no evidence that any UP employee was in the area between the time a train passed safely over the switch the day before and the accident. The lack of evidence of such activity is both a deficiency in plaintiff's burden to generate an issue of material fact and affirmative evidence that no UP employee used the siding in an official capacity at the relevant time. *See Torgerson*, 643 F.3d at 1042; *see also*

FED. R. EVID. 803(7). Any conclusion that UP changed the switch alignment because at some point in the past UP used the siding would rely on pure speculation or conjecture. Thus, the evidence failed to show that UP caused the switch to be moved out of its designated position.

Miller's focus on the other elements of a FELA claim are misplaced. It is true that under a FELA negligence per se theory, Miller need not show that UP acted negligently in violating a safety regulation. Thus, for example, UP would still be liable if a UP employee aligned the switch for mainline movement, but failed to adequately lock it in place. Even if the employee was not negligent and took reasonable efforts to lock the switch in place, UP would still be liable for any injuries resulting from the misaligned switch. But Miller must still show that UP committed the act that constitutes the violation. Here, there was no evidence a UP employee had anything to do with the improper alignment of the switch.[3]

---

[3]The dissent argues that the court's holding is foreclosed by the Supreme Court's holding in *Kernan v. American Dredging Co.*, and that the Supreme Court's ruling in *O'Donnell* v. *Elgin, Joliet & Eastern Railway Co.* illustrates that a railroad is liable when it violates a safety statute or regulation. These cases are factually distinguishable. In *Kernan* and *O'Donnell*, the facts show that the employer engaged in conduct that violated the statute or regulation. In *Kernan*, the employer set an open-flame kerosene lamp closer to the water than the statute allowed, which led to the ignition of inflammable vapors on the water and the seaman's death. 355 U.S. at 427-28. There was no evidence or suggestion that anyone but the employer was responsible for the location of the lamp. In *O'Donnell*, the railroad used a railcar that did not have a statutorily-prescribed coupler, leading to a worker's death. 338 U.S. 384, 385-86 (1949). In *O'Donnell*, there was no evidence or suggestion that a third party installed the improper coupler on the railcar. Here, the employer complied with the regulation. The evidence was uncontested that UP had properly aligned and locked the switch. The question before the district court, then, was whether plaintiff had presented evidence that generated a genuine issue of material fact whether UP, or a third party, then violated the regulation by changing the alignment. The district court found, and we agree, that plaintiff presented only speculation that a UP employee changed the alignment and, even if a UP employee did so, the employee acted outside the scope of employment.

Similarly, under FELA a railroad would be liable if the railroad's conduct contributed to the injury, no matter how slight or small that railroad's conduct was in contributing to the injury. For example, if a UP employee properly aligned the switch, but failed to properly lock it (even if that failure was not negligent), and a third party criminally moved the unlocked switch to the siding track, UP would still be liable even though the criminal was primarily responsible for the resulting injuries. Here, again, there is no evidence a UP employee played any role in the changing of the switch. The switch had been properly aligned and locked, a train had safely passed over the switch a day before, and the evidence showed that someone had tampered with the switch, lock, and other preventive measures. There is no evidence in the record that any act of a UP employee contributed to the misalignment.

Miller repeatedly asserts that FELA imposes an "absolute duty" on railroads to comply with safety regulations. Neither the Supreme Court nor this Court has held that to be the case. When we have used the phrase "absolute duty," it was with respect to that portion of FELA that allows for causes of action based on other statutes. This Court has said, for example, that "[t]he [Federal Safety Appliance Acts, 49 U.S.C. § 20301 et seq.,] impose[s] [an] absolute dut[y] on railroads to provide required safety equipment on their trains, including safe power braking systems." *Grogg v. Mo. Pac. R.R. Co.*, 841 F.2d 210, 212 (8th Cir. 1988) (citations omitted). *Cf. O'Donnell*, 338 U.S. at 389, 390 n.7 (ruling that even the Federal Safety Appliance Act that requires railroads to ensure secure coupling–"in no way dependent on negligence"–has a limited defense for intervening acts, such as saboteur). Similarly, the Locomotive Inspection Act, 49 U.S.C. § 20701 et seq. imposes "an absolute and continuing duty to maintain [a] locomotive." *Lilly v. Grand Trunk W. R.R. Co.*, 317 U.S. 481, 485 (1943). The same is true of the Locomotive Inspection Act's predecessor, the Boiler Inspection Act. *Urie*, 337 U.S. at 188 (1949). In contrast, neither the Supreme Court nor this Court has found that the FRSA regulation at issue here imposes an absolute duty on railroads to ensure employee safety. The provisions of 45 U.S.C. § 51 which establish a negligence cause of action under

-11-

FELA do not establish absolute liability. "[FELA] does not make the railroad an absolute insurer against personal injury damages suffered by its employees." *Wilkerson v. McCarthy*, 336 U.S. 53, 61 (1949).

Because UP committed no act violating the regulation requiring switches to be aligned per the railroad's written policy, the district court did not err in granting summary judgment on Count II of Miller's complaint.[4]

V.

Miller also alleged that UP breached its duty of care under FELA because it failed to: (1) properly align the switch for main track movement; (2) protect its keys; (3) remove the unused sidetrack and switch; (4) use other methods to secure the switch; and (5) keep the switch position indicator clearly visible and clear of vegetation. To prove a FELA negligence claim, a plaintiff must prove the common law elements of negligence. This includes an element of foreseeability. *See McBride*, 564 U.S. at 703 (emphasizing that "reasonable foreseeability of harm . . . is indeed 'an essential ingredient of FELA *negligence*.'" (alteration omitted, emphasis original) (quoting *Gallick v. Balt. & Ohio R.R.*, 372 U.S. 108, 117 (1963)). Thus, UP's knowledge is an affirmative element of Miller's negligence claim. In other words, summary judgment was appropriate unless Miller proffered evidence showing a genuine issue of material fact that UP had a "reasonable ground to anticipate that a

---

[4]The district court ruled that Section 218.105 has a knowledge requirement Miller did not satisfy, and in the alternative, ruled that if UP failed to comply with the regulation, its conduct was excused because it took reasonable care to comply with the regulation. We need not address these issues. *See Reasonover v. St. Louis Cty.*, 447 F.3d 569, 578–79 (8th Cir. 2006) ("We may affirm summary judgment for any reason supported by the record, even if it differs from the rationale of the district court.").

particular condition . . . would or might result in a mishap and injury[.]" *Burckhard v. BNSF Ry. Co.*, 837 F.3d 848, 853–54 (8th Cir. 2016) (first alteration in original).

Here, UP cannot be liable under a negligence theory for failing to properly align the switch unless it knew or had reason to know it was misaligned. There was no evidence that UP was aware the switch was not properly aligned. As noted, UP twice inspected the switch within days of the accident and another train safely passed over the switch the day before the accident. Miller produced no evidence that UP was aware or had reason to believe that the switch had been or would be misaligned by a third party.[5]

Likewise, Miller presented no evidence that UP failed to reasonably protect its keys or had reason to know that the security of its keys or locks were compromised. There was no evidence proffered that keys were stolen from UP or any of its facilities. The only evidence was that someone stole 102 keys from an Amtrak facility in Oklahoma City. Miller presented no evidence that UP was aware of that burglary before the accident or had reason to believe additional steps were needed to protect its switches from the criminal who had stolen the 102 keys.

And although removal of the switch or unused siding track would have prevented this accident, that does not mean that UP was negligent if it failed to do so. Miller proffered no evidence of an industry standard or other evidence that could lead a jury to find UP negligent for failing to remove the switch or track. The mere

---

[5]As the district court noted, even if the person who misaligned the switch was a UP employee, Miller did not point to any evidence that the employee was acting within the scope of employment. Thus, UP would not be liable for the purported rogue employee's act under a respondeat superior theory. Miller did not challenge that finding on appeal. *Beasley v. Warren Unilube, Inc.*, 933 F.3d 932, 936 n.3 (8th Cir. 2019) ("Because Beasley failed to raise this claim in his opening brief on appeal, the argument is waived.").

existence of alternate safer methods alone does not establish negligence under FELA. *See Abernathy v. E. Ill. R.R. Co.*, 940 F.3d 982, 988 (7th Cir. 2019); *Wright v. BNSF Ry. Co.*, 177 F. Supp. 3d 1310, 1316 (N.D. Okla. 2016).

Miller relies on *Stone v. New York, C., & St. L. R. Co.*, 344 U.S. 407 (1953), to support his argument that the existence of alternate safer methods to perform the job is evidence that the defendant did not act reasonably. In *Stone*, the plaintiff injured his back while he and one other employee were removing track ties using tongs. In determining if the employer was negligent, the Court considered the existence of three alternate methods to remove the ties other than the method used at the time of the injury. The Court also considered other evidence in the record of the employer's negligence, including the fact that there were other difficult ties on the stretch of track, that normally difficult ties were removed using four men instead of two, and the fact that plaintiff told his boss he was pulling as hard as he could but the boss ordered him to pull harder before the injury. The Supreme Court held "all these facts comprise the situation to be appraised in determining whether respondent was negligent. Those circumstances were for the trier of facts to appraise." *Id.* at 409.

Courts have harmonized *Stone* with the principle that the employers need only take reasonable precautions, not every possible precaution, by holding that evidence of alternate safer methods is only relevant when the plaintiff can present some evidence that the method chosen by the employer was negligent. *See Molczyk v. Chic., Cent. & Pac. R.R. Co.*, No. 1:15-cv-00049-CFB, 2018 WL 6356068, at *2 (S.D. Iowa May 4, 2018) ("A plaintiff cannot attempt to prove that the defendant was negligent simply by pointing to alternative methods; he must first present evidence that the method actually employed was not reasonably safe, and may then seek to introduce evidence that safer alternative methods existed, that those methods were available at the time, and that they had been used under similar circumstances." (citing *Myrick v. Union Pac. R.R. Co.*, 84 N.E.3d 504, 531 (Ill. Ct. App. 2017) (internal quotation marks omitted)); *Miller v. BNSF Ry. Co.*, Civil Action No.

15-cv-2268-WJM-NYW, 2017 WL 2001678, at *5 (D. Colo. May 11, 2017) ("The evidence in *Stone* reflected a dispute as to whether the method actually used had been reasonably safe. The fact that alternative methods had been available was therefore relevant [to] the jury's determination[.]"); *Uhl v. CSX Transp.*, Civil Action No. 3:08-0064, 2009 WL 1749372, at *7 (S.D. W. Va. June 18, 2009) (holding that evidence of alternative boarding locations was admissible because plaintiff represented he would present evidence that the chosen boarding location was dangerous).

Here, UP took significant steps to ensure that the switch was not lined toward the unused industry track. The switch was spiked, locked, and anchored to prevent misalignment. UP also periodically inspected the switch to make sure it was still properly lined and locked for mainline travel. The only evidence that arguably shows that the chosen method was unreasonable is that numerous people, including employees from other railroads, had access to 102 keys. This is not enough to show that UP's failure to adopt yet more measures to ensure safe travel on the mainline track constituted negligence.

Similarly, Miller failed to point to any evidence that would establish that UP was negligent if it failed to install additional or different devices to prevent someone from tampering with the switch. Miller suggests that UP could have used a "clamping" method to further protect the switch. Railroads use a clamp to temporarily protect tracks while performing maintenance and a UP employee testified that the method could have been used on the switch here. Miller also suggests that UP could have used a combination lock on which a universal 102 key would not work. Although it is again possible that these other measures could have prevented the accident in this case, there is no evidence that these measures constituted the standard of care in the industry or that the measures UP did take were unreasonable such that failure to implement the additional measures Miller advocates in hindsight constituted negligence.

-15-

Finally, Miller alleged that UP was negligent for failing to maintain the switch position indicator such that it was visible at a reasonable distance of 1,000 feet. Here, at 1,500 feet Miller saw a silver stripe on the position indicator. He began breaking at least 800 feet before the switch. There was no evidence before the district court to generate an issue of fact about whether the accident could have been prevented had Miller seen the reflector sooner than he did. Miller adduced no evidence that a switch must always be visible from a thousand feet because other factors, including geometry and geography, can affect its visibility. Miller presented no evidence that vegetation interfered with the visibility of the switch. The district court also noted that Miller presented no evidence about the physical condition of the switch reflector itself, the curvature of the track, or other factors important in assessing the distance from which the switch indicator should have been visible.[6] Moreover, the evidence here showed that the switch had not been fully locked into its misaligned position, which may also have affected its visibility. UP is responsible for ensuring the position indicator is sufficiently visible when the switch is fully locked in one position or another. Here, plaintiff offered nothing but "mere speculation, conjecture, or fantasy" to support his claim that the switch should have been visible from a greater distance and whether the accident could have been avoided if it had been. *Putman*, 348 F.3d at733-34.

In sum, the district court did not err in concluding that there was no genuine issue of material fact whether UP was negligent.

---

[6]On appeal, Miller points to evidence in the record that the track was straight at this location, but failed to point to such evidence before the district court. The district court was not "obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *White v. McDonnell Douglas Corp.*, 904 F.2d 456, 458 (8th Cir. 1990).

VI.

Accordingly, we affirm the judgment of the district court.

COLLOTON, Circuit Judge, dissenting.

Appellant Miller sued Union Pacific for negligence under the Federal Employers' Liability Act (FELA). As the court acknowledges, "a railroad's violation of a safety statute . . . is negligence per se" under the FELA. *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 703 n.12 (2011). Negligence per se is a "label for what is simply a violation of an absolute duty." *Carter v. Atlanta St. & A.B. R. Co.*, 338 U.S. 430, 434 (1949). As the court also recognizes, if a plaintiff shows that a railroad violated a statutory duty, then he has established negligence for purposes of the FELA and need not prove the common-law elements of foreseeability, duty, or breach. "Once the violation is established, only causal relation is at issue." *Id.*

Miller contends that Union Pacific violated a federal regulation promulgated under the Federal Railroad Safety Act (FRSA), 49 U.S.C. § 20103. The regulation governs main track switches, and provides as follows: "The normal position of a hand-operated main track switch shall be designated by the railroad in writing and *the switch shall be lined and locked in that position when not in use*," except in circumstances not applicable here. 49 C.F.R. § 218.105(b) (emphasis added). Each railroad must have an operating rule that complies with that requirement. *Id.* § 218.105(a). Union Pacific has such a rule, to wit: "The normal position of a main track switch is for main track movement, and *it must be lined and locked in that position*." R. Doc. 41-2, at 2 (emphasis added). When a railroad violates a requirement of the operating rule, the railroad "shall be considered to have violated the requirements of" the federal regulation. 49 C.F.R. § 218.105(a).

Whether Union Pacific violated the safety regulation depends on the meaning of the operating rule and the regulation. The rule requires that a main track switch "must be lined and locked" for main track movement. Miller was injured when a misaligned switch caused the train that he was operating partially to derail. Union Pacific operated the railroad track and the main track switch, so it was the "person" responsible for complying with the regulation and ensuring that the switch was lined and locked. *See* 49 C.F.R. § 218.105(a). At the time of Miller's injury, the switch was not "lined and locked" for main track movement. It follows that Union Pacific violated the safety regulation requiring that the switch must be lined and locked in the normal position. The railroad was therefore negligent per se under the FELA, subject to a possible defense based on an intervening and independent cause. *See O'Donnell v. Elgin, J. & E. R. Co.*, 338 U.S. 384, 394 n.7 (1949).

Union Pacific and the court advance several arguments to avoid this straightforward conclusion. First, the court accepts the railroad's contention that while the Safety Appliance Act and Locomotive Inspection Act impose absolute duties on railroads that are enforced through the FELA, Union Pacific has no "absolute duty" to comply with safety regulations promulgated under the FRSA. *Ante*, at 11. Given that violation of an "absolute duty" is synonymous with "negligence per se," *Carter*, 338 U.S. at 434, the court's reasoning effectively eliminates a claim of negligence per se under the FELA when it is based on a violation of railroad safety regulations.

The court's conclusion was effectively rejected more than sixty years ago in *Kernan v. American Dredging Company*, 355 U.S. 426 (1958). There, the Supreme Court held that the FELA and the Jones Act both "impose upon the employer the duty of paying damages when injury to the worker is caused, in whole or in part, by the employer's fault." "This fault may consist of a breach of the duty of care . . . or of *a breach of some statutory duty*." *Id*. at 432-33 (emphasis added). The Court rejected the contention that "fault" was limited to violations of the Safety Appliance Act and

-18-

the Boiler Inspection Act, or that an employee's injury flowing from a statutory violation must be the injury the statute sought to prevent. *Id*. at 433.

The employer in *Kernan* violated a rule promulgated by the Coast Guard, *id*. at 427 & n.1, and the Court deemed the infraction to be a violation of the statute under which the regulation was promulgated. *Id*. at 428, 438 n.8. The dissenting opinion in *Kernan* argued for a narrower view of the FELA, but acknowledged the Court's contrary conclusion based on earlier precedent: "The Court thus reads these decisions to establish a doctrine under the FELA that *injuries following any violation of any statute, not simply the Safety Appliance and Boiler Inspection Acts, are actionable without any showing of negligence . . . .*" *Id*. at 445 (Harlan, J., dissenting) (emphasis added).

*Kernan* guides the analysis here. Under the FELA, there is "a bright-line rule" that an "employer's violation of a statutory or regulatory duty gives rise to FELA liability for a resulting employee injury." *Schmitz v. Canadian Pac. R. Co.*, 454 F.3d 678, 683 (7th Cir. 2006). As with the breach of the Jones Act regulation in *Kernan*, a violation of a regulation promulgated under the Federal Railroad Safety Act is the equivalent of a statutory violation that establishes negligence per se under the FELA. *See id*. at 682-83; *Eckert v. Aliquippa & S. R. Co.*, 828 F.2d 183, 187 (3d Cir. 1987); *Mosco v. Baltimore & Ohio R.R.*, 817 F.2d 1088, 1091 (4th Cir. 1987).

Second, Union Pacific and the court maintain that the railroad does not violate the safety regulation at 49 C.F.R. § 218.105(b) unless it undertakes an "act" that causes a switch to be out of alignment. Whether the railroad violated a regulation, however, depends simply on the meaning of the regulation. The regulation at issue says flatly that a track switch operated by the railroad "shall be lined and locked" in the normal position. The rule does not merely provide that railroad employees must refrain from acts that cause a switch to be misaligned. Where the text of the regulation does not define a violation in terms of a causative act of the railroad, the

-19-

employee need not prove such an act to establish a violation. The court's inquiry into whether the railroad "played any part, even the slightest," in causing the switch to be moved, *ante*, at 9, confuses the question whether the railroad violated the regulation (and was therefore negligent per se) with the separate element of whether the employer's negligence (*i.e.*, the violation of the regulation) caused the employee's injury. *See Rogers v. Mo. Pac. R. Co.*, 352 U.S. 500, 506 (1957) ("Under [the FELA] the test of a jury case is simply whether the proofs justify with reason the conclusion that *employer negligence* played any part, even the slightest, in producing the injury or death for which damages are sought.") (emphasis added).

*O'Donnell* is illustrative. The Safety Appliance Act made it unlawful for a railroad to use any car that was "not equipped with couplers" that would remain coupled until set free by some purposeful act of control. 338 U.S. at 387 & n.2, 389. When an employee presented evidence "showing the breaking of the coupler," he established a violation of the Act, *id*. at 393, because the statutory requirement was simply to refrain from using any car that was "not equipped" with couplers that would remain coupled. The employee was not required to show that an act by the railroad caused the coupler to break. A railroad, the Court explained, could not "escape liability for a coupler's inadequacy by showing that too much was demanded of it, nor by showing that while the coupler broke it had been properly manufactured, diligently inspected and showed no visible defects." *Id*. at 393.

To justify reading a causal act requirement into the regulation on track switches, the railroad and the court invoke *Edwards v. CSX Transp. Inc.*, 821 F.3d 758 (6th Cir. 2016), but the analogy is wanting. *Edwards* held that because a regulatory requirement that restrooms "shall be sanitary" was tied to a daily inspection routine, and the next required inspection had not "become due" when a particular restroom was found unsanitary, the complaining employee did not establish a violation of the rule. *Id*. at 761. The court attempts to draw a parallel by citing a regulation from Track Safety Standards that requires a monthly inspection of each

track switch. 49 C.F.R. § 213.235. The required inspections, however, are designed only to "detect deviations from the standards prescribed *in this part*," that is, Part 213 of the regulations. 49 C.F.R. § 213.231 (emphasis added). The rule that a main track switch must be "lined and locked" appears in Part 218 on Railroad Operating Practices. The inspections under Part 213 are not aimed at detecting deviations from a standard prescribed in Part 218. The Part 213 inspection regime thus does not qualify the requirement of § 218.105(b) that a main track switch "shall be lined and locked" or absolve the railroad of responsibility for alignment of switches during the period between monthly inspections.[7]

Third, Union Pacific defends the district court's conclusion that the safety rule on track switches includes a knowledge element, such that the railroad violates the regulation only if it knows or has notice that a switch is misaligned. The court does not adopt this argument, *ante*, at 12 n.4, and the railroad's interpretation is incorrect. The rule on alignment of main track switches appears in Part 218 of the regulations on Railroad Operating Practices. The railroad derives the knowledge requirement from a provision that appears in Part 213 on Track Safety Standards, which states: "any owner of track to which *this part* applies who knows or has notice that the track

---

[7]Even if a violation of the regulation were premised on a casual act by the railroad, there likely would be a genuine dispute of fact about who caused the switch to be misaligned. Opening the switch required a key that Union Pacific provided to numerous employees, and Miller marshals circumstantial evidence in support of an inference that a railroad employee unlocked the switch and misaligned it while performing maintenance or otherwise. Reply Br. 17. While there is no *direct* evidence that a railroad employee was at the switch location within the scope of his duties, there also is no direct evidence that a third-party criminal or rogue employee misaligned the switch. The court refers to evidence that switch keys were stolen in a burglary, *ante*, at 3, but even if that would be circumstantial evidence of a crime at the switch, the only evidence of stolen keys is inadmissible hearsay, *see* R. Doc. 69-1, at 2, which "may not be used to support or defeat a motion for summary judgment." *Brooks v. Tri-Systems, Inc.*, 425 F.3d 1109, 1111 (8th Cir. 2005).

does not comply with the requirements of *this part*," must take certain actions. 49 C.F.R. § 213.5(a) (emphases added). The directive does not apply to Part 218 and the regulation on main track switches.

When the Federal Railroad Administration adopted the Track Safety Standards in 1998, the agency recognized that the "knowledge standard is unique to the track regulations; other FRA regulations are based on strict liability." *Track Safety Standards*, 63 Fed. Reg. 33,992-01, 33,995 (June 22, 1998). Ten years later, when the agency promulgated Part 218 and the rule on main track switches, it did not incorporate the "unique" knowledge requirement from Part 213. Therefore, a railroad violates the terms of § 218.105(b) if a switch is not "lined and locked" in the normal position, regardless of the railroad's knowledge.

Fourth, the railroad defends the district court's conclusion that the railroad's violation of the regulation was excused. The district court cited the common-law principle that "[a]n actor's violation of a statute is excused and not negligent if . . . the actor exercises reasonable care in attempting to comply with the statute." Restatement (Third) of Torts: Phys. & Emot. Harm § 15 (Am. Law Inst. 2010). The court does not endorse this conclusion either, *ante*, at 12 n.4, and the argument fails because the FELA does not incorporate such a common-law rule. The duty under the FELA to comply with a statute "is an absolute one, and the carrier is not excused by any showing of care, however assiduous." *Brady v. Terminal R. Ass'n of St. Louis*, 303 U.S. 10, 15 (1938). Liability "cannot be escaped by proof of care or diligence." *O'Donnell*, 338 U.S. at 390.

Based on the undisputed fact that the main track switch was not locked and lined in the normal position at the time of the accident, Miller has established that the railroad violated the safety regulation at 49 C.F.R. § 218.105(b). With one possible caveat, that is sufficient to establish negligence per se. In *O'Donnell*, the Supreme Court declined to say that a railroad may never effectively defend under the FELA by

showing that noncompliance with a statutory command was the result of an "intervening and independent cause" such as "the work of a saboteur." 338 U.S. at 394 n.7. The parties and the district court have not addressed that issue in this case. On remand, the district court could determine in the first instance whether an "intervening and independent cause" defense is available under the FELA and, if so, could allow the railroad to present evidence of its saboteur theory as a defense at trial.

For these reasons, I would reverse the grant of summary judgment and remand the case for further proceedings.

_____