Judgment rendered November 26, 2025.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 56,527-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

MICHAEL WALLER                                    Plaintiff-Appellee

versus

KANSAS CITY SOUTHERN                              Defendant-Appellant
RAILWAY COMPANY

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 625,812

Honorable Ramon Lafitte, Judge

* * * * *

PHELPS DUNBAR LLP                                 Counsel for Appellant
By: A. Paul LeBlanc, Jr.

KNEZEK LAW
By: Elena A. Knezek
    L. Bianca Chretien
    Danielle A. Boudreaux

MAYER, SMITH & ROBERTS, LLP                       Counsel for Appellee
By: Ben Marshall, Jr.

ROVEN CAMP, PLLC
By: John D. Roven
    Kevin M. Camp

SCOTT CRICHTON LAW, LLC
By: Scott J. Crichton

LAW OFFICES OF MARY WATSON SMITH, LLC
By:  Mary Watson Smith

* * * * *

Before STEPHENS, ROBINSON, and ELLENDER, JJ.

**STEPHENS, J.,**

This appeal arises out of the First Judicial District Court, Parish of Caddo, State of Louisiana, the Honorable Ramon Lafitte, Judge, presiding. An 11-day jury trial was held in this action brought by the plaintiff, Michael Waller, against the defendant, Kansas City Southern Railroad Company ("KCS"), for injuries he sustained during the course and scope of his employment with KCS. The exclusive remedy for any injured railroad worker lies under the Federal Employer's Liability Act ("FELA"), 45 U.S.C.A. §§ 51-60. After deliberations, the jury rendered its verdict finding KCS to be 80% at fault and Waller to be 20% at fault and assessing Waller's total damages at $5,380,665.06.

Following a post-trial "Motion to Enter Judgment" filed by Waller, the trial court rendered a final judgment on May 9, 2024, in which the jury's determination of 20% fault on the part of Waller was reflected, but the trial court did not reduce the damage award to Waller by his percentage of fault, which resulted in the plaintiff being awarded the full sum of $5,380,665.06. KCS filed a motion for new trial, which was denied by the trial court on October 18, 2024. Thereafter, KCS filed the instant appeal. For the reasons set forth below, we amend the trial court's judgment, and, as amended, affirm.

## FACTS/PROCEDURAL BACKGROUND

On September 11, 2017, Waller, who had been employed for 17 years as an electrician at KCS's Shreveport Diesel Repair Shop (the "Shop"),[1] was

---

[1] The Shop is where KCS employees maintain and repair locomotives and related equipment. Rail tracks run directly into the Shop so that locomotives can be driven into the Shop and components and other equipment removed for reworking and repair.

almost at the end of his work shift. Instead of using the designated locker room, Waller changed out of his personal protective equipment ("PPE") and into his street clothes at his tool locker in the Shop. Waller, unable to slide his left shoe over his left heel, and with his left foot not properly in his shoe, walked over to a fan housing[2] lying about seven and one-half feet away on the Shop floor and leaned against it (in preparation to sitting on the fan housing). When Waller put his weight against the fan housing, it shifted to its side and pinned Waller's left foot underneath, crushing his foot where it met at the ankle and heel.

Waller's injuries were severe. His heel was lacerated, and he sustained permanent damage to his left foot, including internal damage to his large toe. Waller has had surgery to attempt (unsuccessfully) to restructure his Achilles tendon. He has developed traumatic arthritis in his big toe joint and hypersensitivity in his heel which prevents him from walking or bearing any substantial weight on his left leg. Instability has caused Waller to fall multiple times. One such fall caused him to aggravate a pre-existing injury to his wrist. He had two surgeries to repair the damage, but full flexibility could not be restored. Waller suffers from intense pain, numbness, and swelling and has been diagnosed with Chronic Regional Pain Syndrome.

Waller filed the instant suit against KCS on September 14, 2020, seeking damages for his injuries based on negligence on the part of KCS, arising out of, *inter alia*, the railroad's alleged failure to follow Occupational Safety and Health Administration ("OSHA") regulations for the safe

---

[2] The fan housing is a piece of equipment used for cooling a locomotive engine which had been removed and placed in the Shop to be worked on. A fan housing weighs about 3,000 lbs., is 65 inches tall, and about 15 feet long. This particular fan housing had been placed on the Shop floor in a "V" configuration rather than on its side.

2

operation of overhead cranes.  Various pleadings were filed by both parties thereafter.  On April 21, 2023, KCS filed a motion for partial summary judgment, in which it argued that it had provided Waller with a reasonably safe workplace; the accident was solely the fault of Waller; and OSHA regulations did not apply to the accident, as the crane was not attached or being used at any point near the time of the accident.  This motion was denied by the trial court.  On August 17, 2023, the trial court held a hearing on five motions *in limine*—one filed by the plaintiff and four by KCS.  One of many prohibitions sought by KCS was that Waller not be allowed to argue that any violation of an OSHA standard would constitute negligence *per se*, a finding which would bar its contributory negligence defense.  At the hearing, Waller's attorneys indicated that they would not be submitting this issue to the jury but rather would pursue it post-trial.  Thus, the trial court granted this requested prohibition sought by KCS.

Prior to trial the parties submitted proposed jury instructions.  Waller tried to submit an instruction on negligence *per se*, which was objected to by KCS.  The trial court sustained the defendant's objection and deleted the requested instruction, and the jury was not instructed on negligence *per se*.  However, over KCS's objection, the final verdict form did contain an interrogatory asking the jury to determine whether KCS had violated ASME B.30.2 § 2-3.3.3[3] (a standard incorporated into OSHA).[4]

The 11-day trial began on January 22, 2024.  The main theory of Waller's case was that the placement of the fan housing in a "V"

---

[3] ASME stands for American Society of Mechanical Engineers.

[4] ASME B.30.2 § 2-3.3.3 deals with management responsibility for training "to promote proficient performance of a crane operator."

configuration created a workplace hazard because the fan housing was less stable in this configuration than if it had been laid on its side. In presenting this theory to the jury, Waller relied, *inter alia*, on violations of KCS's workplace rules and regulations regarding the operation of cranes and a crane operator's handling of loads through the testimony of Mark Webster and Carter Hasty. KCS presented evidence that nothing in ASME B.30.2 § 2-3.3.3 addressed how materials transported by a crane were to be placed or stored after being transported; instead, that particular section solely addressed training related to the operation of a crane and did not even specify what that training should include. Waller's expert, Mark Webster, who admitted on cross-examination that KCS trains its crane operators and that KCS was not cited for any regulatory violation due to this incident, identified two putative violations of ASME B.30.2 § 2-3.3.3, which concerned KCS's inability to identify or document, after Waller's injury, the personnel involved in moving the fan housing to the Shop.

Trial concluded on February 5, 2024. After being instructed on the applicable law, the jury deliberated and returned its verdict, which contained the following factual findings and damages award:

- KCS was negligent and its negligence was a cause of Waller's injuries;
- KCS violated ASME B 30.2 § 2-3.3.3, and this violation was a cause of Waller's injuries;
- Waller was negligent, and his negligence was a cause of his injuries;
- KCS was 80% at fault, and Waller was 20% at fault; and
- Special damages in the amount of $1,440,655.06, and general damages in the amount of $3,940.000.00, for a total award of $5,380,655.06.

As noted above, the jury verdict form contained an interrogatory regarding whether KCS had violated ASME B.30.2 § 2-3.3.3. The jury

4

instructions did not include one on negligence *per se*; instead, the jury was instructed that it was allowed to assign fault to Waller if it found his conduct to be negligent, even if it had determined there had been a violation of ASME B.30.2 § 2-3.3.3.

Waller then moved for entry of a final judgment on the verdict and asked the trial court to adjudicate an issue that had not been submitted to the jury, i.e., whether ASME B.30.2 § 2-3.3.3 was a safety statute, the violation of which would preclude KCS from asserting the defense of contributory (comparative) negligence (and could, depending on the judge's interpretation of applicable federal law, result in no reduction of the damages awarded to Waller **by the jury** based on the percentage of fault assigned to him **by the jury**). KCS filed an opposition to the motion, but after a hearing, Waller's motion was granted by the trial court, and final judgment awarding Waller damages in the amount of $5,380,655.06 unreduced by the 20% comparative fault assessed by the jury to Waller was rendered by the trial court on May 9, 2024.

A motion for new trial filed by KCS was denied by the trial court on October 18, 2024. This appeal ensued.

## DISCUSSION

**(1) The trial court erred in denying KCS's motion for summary judgment because there was insufficient evidence of negligence on its part.**

According to KCS, the trial court erred in denying its second motion for summary judgment. KCS urges that it is entitled to a *de novo* review of the entire record to determine whether it is entitled to judgment in its favor as a matter of law on this issue, citing *Hall v. Folger Coffee Co.*, 03-1734 (La. 4/14/04), 874 So. 2d 90. According to KCS, no reasonable juror could

have found that KCS failed to provide Waller with a reasonably safe workplace.

Waller argues that appellate review of the trial court's denial of KCS's motion for summary judgment is foreclosed and notes that after trial on the merits, the *de novo* standard applicable pretrial is no longer applicable; the issue is now reviewed under the manifest error standard applicable to the full record. According to Waller, the record establishes that KCS violated its own safety rules and the recognized standards of crane safety, which provides more than a reasonable basis for the jury's finding that the hazard was plainly foreseeable.

We agree with Waller that appellate review of the trial court's denial of summary judgment is improper after a full trial on the merits. *See*, *Hood v. Cotter*, 08-0215, p. 7 (La. 12/2/08), 5 So. 3d 819, 823. At this juncture, this Court is not precluded from considering the issues raised by KCS's argument, but they are to be considered in view of the evidence presented at trial, and under the proper standard of review, which is set forth below.

FELA generally provides the exclusive federal tort remedy for railroad employees seeking to recover for personal injury sustained in the course of their employment. *Norfolk Southern Railway Co. v. Sorrell*, 549 U.S. 158, 165, 127 S. Ct. 799, 166 L. Ed. 2d 638 (2007); *Erie Railroad Co. v. Winfield*, 244 U.S. 170, 172, 37 S. Ct. 556, 61 L. Ed. 1047 (1917). FELA was enacted in response to the dangers of working for the railroad and the high rate of injuries among railroad employees. *Consolidated Rail Corp. v. Gottshall*, 512 U.S. 532, 542-43, 114 S. Ct. 2396, 129 L. Ed. 2d 427 (1994); *Lynch v. Northeast Regional Commuter R.R. Corp.*, 700 F. 3d 906 (7th Cir. 2012).

6

A railroad is charged with providing a reasonably safe work environment for its employees. *Urie v. Thompson*, 337 U.S. 163, 179, n. 16, 69 S. Ct. 1018, 93 L. Ed. 1282 (1949); *Huffman v. Union Pacific R.R.*, 675 F. 3d 412 (5th Cir. 2012), *cert. denied*, 586 U.S. 1086, 133 S. Ct. 840, 184 L. Ed. 2d 653 (2013). "FELA's language is straightforward: Railroads are made answerable in damages for an employee's injury or death resulting in whole or in part from [carrier] negligence." *CSX Transportation Inc. v. McBride*, 564 U.S. 685, 703, 131 S. Ct. 2630, 2643, 180 L. Ed. 2d 637 (2011). Negligence within the meaning of FELA exists if the defendant railroad "knew or by the exercise of due care should have known" that its conduct was "inadequate to protect [the plaintiff] and similarly situated employees." *Urie*, 337 U.S. at 178, 69 S. Ct. at 1018.

The initial inquiry is whether the carrier failed to observe that degree of care "which people of ordinary prudence and sagacity would use under the same or similar circumstances." *McBride*, *supra*, *citing Gallick v. Baltimore & Ohio R.R. Co.*, 372 U.S. 108, 117, 83 S. Ct. 659, 9 L. Ed. 2d 618 (1963). The railroad's duties are measured by what is reasonably foreseeable under like circumstances. If one has no reasonable ground to anticipate that a particular condition would or might result in a mishap and injury, then that party is not required to do anything to correct the condition. *McBride*, *supra*; *Gallick*, 372 U.S. at 118, n. 7, 83 S. Ct. 659. If negligence is proved and is shown to have played any part, even the slightest in producing the injury, *Rogers v. Missouri Pacific R.R. Co.*, 352 U.S. 500, 77 S. Ct. 443, 1 L. Ed. 2d 493 (1957), then the carrier is answerable in damages even if "the extent of the [injury] or the manner in which it occurred was not probable or foreseeable." *McBride*, 564 U.S. at 703-04, 131 S. Ct. at 2643;

7

*Gallick*, 372 U.S. at 120-121, 83 S. Ct. 659. The standard of care for both employer and employee is ordinary prudence under the circumstances. *Huffman*, 675 F. 3d at 418; *Gautreaux v. Scurlock Marine, Inc.*, 107 F. 3d 331, 338-39 (5th Cir. 1997).

Determining liability under FELA is a federal question. *Sinkler v. Missouri Pacific R.R. Co.*, 356 U.S. 326, 78 S. Ct. 758, 2 L. Ed. 2d 799 (1958); *Bodenheimer v. New Orleans Public Belt*, 02-0441 (La. App. 4 Cir. 5/14/03), 845 So. 2d 1279, *writ granted in part on other grounds*, 03-1855 (La. 11/14/03), 860 So. 2d 534. Although state courts have concurrent jurisdiction pursuant to 45 U.S.C. § 56, federal substantive law must be applied. *Monessen Southwestern Railway Co. v. Morgan*, 486 U.S. 330, 108 S. Ct. 1837, 100 L. Ed. 2d 349 (1988); *Harris v. Kansas City Southern Railway Co.*, 55,764 (La. App. 2 Cir. 7/17/24), 399 So. 3d 532, *writ denied*, 24-01041 (La. 11/14/24), 396 So. 3d 63; *Broussard v. Union Pacific Railroad Co.*, 29,768 (La. App. 2 Cir. 8/28/97), 700 So. 2d 542, *writ denied*, 97-2414 (La. 12/12/97), 704 So. 2d 1202; *Bodenheimer*, *supra*. However, state rules of procedure apply in state court. *St. Louis Southwestern. Ry. Co. v. Dickerson*, 470 U.S. 409, 105 S. Ct. 1347, 84 L. Ed. 2d 303 (1985); *Harris*, *supra*.

Regarding the standard of review applicable to a jury's finding of negligence under FELA, an appellate court may not reverse findings of fact in a FELA case unless there is a complete absence of probative facts to support the conclusions reached by the fact-finder. *Id.*; *Richardson v. Kansas City Southern Ry. Co.*, 31,735 (La. App. 2 Cir. 4/1/99), 731 So. 2d 1017, *writ denied*, 99-1267 (La. 6/18/99), 745 So. 2d 607; *Broussard*, 29,769, p. 10, 700 So. 2d at 548. As stated by the Supreme Court:

> [W]here … there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion. And the appellate court's function is exhausted when the evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable.

*Lavender v. Kurn*, 327 U.S. 645, 653, 66 S. Ct. 740, 744, 90 L. Ed. 916 (1946); *Lang v. Texas & Pacific Ry. Co.*, 624 F. 2d 1275, 1278 (5th Cir. 1980); *Broussard*, *supra*.

In FELA cases, courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable. *Tennant v. Peoria & Pekin Union Ry. Co.*, 321 U.S. 29, 35, 64 S. Ct. 409, 412, 88 L. Ed. 520 (1944); *Heater v. Chesapeake & Ohio Ry. Co.*, 497 F. 2d 1243, 1247 (7th Cir. 1974), *cert. denied*, 419 U.S. 1013, 95 S. Ct. 333, 42 L. Ed. 2d 287 (1974).

We have examined the testimony and evidence presented at trial and find that there is not a "complete absence of any probative facts" to support the jury's factual conclusion that KCS was negligent and that its negligence played a part in causing Waller's injury. *See*, *Harris*, *supra*; *Richardson*, *supra*.

Waller's career-ending injury occurred in KCS's diesel repair shop when his left foot was crushed by a 3,000-lb. "V" shaped fan housing that tipped over when he leaned against it to put his shoe on. This heavy locomotive component had been placed by another KCS employee 90 inches from Waller's tool locker. The identity of the employee who placed the fan housing in that position rather than on its side was never ascertained by KCS management. According to Jeri Wright, the KCS claims agent who

investigated the accident, the only person she interviewed in connection with the incident was Waller himself; she did not talk with any other crew members working on Locomotive 2826, nor did she try to determine how long the fan housing had been in place or whether there had been a job briefing.

Waller testified that he utilized his tool locker throughout his eight-hour shifts, not just to change into and out of PPE, but for access to and storage of tools and blueprints needed for his job. He stated that other employees with tool lockers on the shop floor did so as well. He further testified that at the time he was injured, there was no rule that required him to change in the west locker room. There was no "one" designated area for employees to change into and out of their PPE and work boots. He and other employees had been changing their boots at the tool lockers for about ten years. Additionally, there was no designated walkway for them to enter the diesel shop; there were three live rails or tracks between the shop and the parking lot.

Mark Webster, an expert in forensic engineering who testified for the plaintiff, related that he is a mechanical engineer whose specialization is in engineering used in accident investigations. He has 13 patents in materials handling, including several in lifting systems. Webster is a part of several professional organizations, including ASME, and has been involved with the committees which oversee and promulgate standards.

Webster testified that the ASME standards are applicable to all industries. Specifically, OSHA has adopted and incorporated the B.30.2 standard as a part thereof. He then discussed Subsection 2-3.3.3 and opined that, in light of KCS's responses to Waller's "Requests for Admissions,"

KCS failed to meet its responsibilities as an employer as it could not determine who made the lift that placed the fan housing as it had no documentation; had no evidence that it provided training to persons who would operate cranes; had no evidence that persons who moved crane loads were provided with written and practical examinations regarding said crane training; and had no certificates or records indicating such training.

Webster also testified that the process of a crane lift does not end when the load touches the ground. Instead, it ends after the load has been secured and the lifting equipment, chains, slings, etc., have been removed. According to Webster, that should not occur until the load has been secured. Webster further stated that the fan housing was unstable in the position it had been left; it could have been blocked, secured, or put on its side. Webster opined "with a reasonable degree of scientific certainty" that allowing the fan housing to stand on its "V," unsupported, unshackled, and unblocked, was unreasonable. The options available were to lay the component down, block, crib, or jack it, or put a warning sign up. KCS did nothing, stated Webster.

Excerpts of Casey Hall's video deposition were played for the jury. Hall is the safety manager for the railroad in Shreveport. He stated that he is no longer responsible for training but is now a frontline manager—the safety department and training department are now separated, something that happened around 2015 or 2016. The only person he recalls speaking with about Waller's accident is Ms. Wright. He didn't speak with the crew in the overhaul department, including the foreman or supervisor, to find out who was responsible for moving the fan housing or who had left it unattended. It

11

was Hall's opinion that the housing was secured by gravity until it was acted upon by an "outside force", i.e., Waller.

Hall confirmed that all KCS employees are governed by the KCS safety rules—they are given a copy and are expected to know them. They are trained and tested on them. Employees can be disciplined for violating the safety rules. Hall stated that using a crane to move heavy equipment is a frequent part of their daily work, and rules must be strictly observed when heavy items are moved. In this case, they don't know whether the fan housing was moved or set down by someone who was qualified or trained because they don't know who moved it. He doesn't know either way because he doesn't have any evidence to support it "either way." When asked whether he knew there wasn't a manual for the particular crane involved, Hall's response was that he was made aware of that fact "while talking to our company counsel."

Hall admitted that KCS has a rule requiring that one of the ground person's responsibilities is to confirm that a load is resting securely before removing a sling or lifting mechanism and that the fan housing involved in Waller's accident was left unattended before being secured. He confirmed that no task, including a crane movement, is to be commenced until the involved employees are fully aware of potential hazards and have a plan to proceed safely, then admitted that he doesn't know whether such a briefing was done prior to the fan housing being moved and set down near Waller's tool locker.

Excerpts of Jonathan Harris' video deposition were played for the jury. Harris testified that he started at KCS at the same time that Waller did; both men began as laborers. After working as a machinist, Harris became a shift

foreman.  Harris stated that he has always worked with locomotives at the diesel facility.  In his supervisory position, Harris noted that he observed Waller to be a good, safe, and cooperative worker.  At the time of Waller's injury, there were overhaul jobs going on in the back, and they were being supervised by managers.  Cranes were being used to pull the heavy components out of the locomotives being redone, such as the fan hatches (housings), engines, generators, and radiators.

Harris stated that he wasn't involved in the lift of the fan housing that injured Waller.  He has seen fan hatches placed on the floor standing on three points, and he has seen them on their sides.  Placement, whether to put up straight up "on the points" or tilted to the side, is up to each crane operator.

Portions of the videotaped deposition of James Koske were played for the jury as well.  Koske is still employed with the railroad, but he noted that it is no longer KCS; the railroad's name is now Canadian Pacific Kansas City or CPKC.[5]  He is now shop director, although when he started out with the railroad in 2007, he started out as a journeyman electrician.  He worked with Waller when he started and "picked up a few things from Mr. Waller that helped me along my way."

Prior to Waller's accident, he had not seen any rules, regulations, or directives concerning permitted or prohibited entry or exit doors to be used by employees when accessing or exiting the Shreveport diesel shop.  According to Koske, prior to Waller's accident, employees were free to change into and out of their street shoes in a locker room.  They could then

---

[5] However, the railroad will still be referred to as KCS throughout this opinion.

enter or exit the diesel shop from several entrances and exits. After Waller's accident, Koske changed that. Koske stated that he put out a Director's General Circular #13 on the day following Waller's accident on that issue.

Koske identified the "Manager's Report of Employee Injury or Illness" filled out by the manager on duty at the time of Waller's incident, and conceded that it contained two inaccuracies: it answers "N/A" to the question of whether equipment was involved and "N/A" to the name of the person making mechanical inspection, date, and time. Koske acknowledged that the incident occurred as a result of a locomotive component falling on an employee's foot. To his knowledge, Waller was not brought up on disciplinary charges in connection with the accident.

Koske related that he was not aware of the identities of anyone involved in moving the fan housing on which Waller was injured, nor is he aware of any documents containing this information. To his knowledge, there was no job briefing prior to that crane lift. Koske was unable to say "either way." Koske "supposed" that had there been an attempt to determine who was working on that day at that time, someone could have looked at the duty roster for those days to figure out who had been working overhaul around the time of the lift.

In his excerpted video deposition testimony, Tyler Goss stated that he was the "de facto" supervisor in the overhaul area of the diesel shop and responsible for anyone working in that area, but was not on duty at the time of Waller's injury. He received an email informing him of the accident early the next morning and forwarded it to Ms. Wright. Goss testified that he did not interview any of the persons working in overhaul or anyone who otherwise might have witnessed the accident. He stated that he did not

14

direct the placement of the fan hatch, which was placed after its removal from Locomotive 2826, although it is possible he had input or involvement in the decision as to when it was removed and its possible placement. He just had no "recall specifically" nor did he remember a job briefing "specifically" regarding the removal of the fan hatch from that locomotive.

Regarding employees training for the operation of cranes, Goss testified that they received "on the job" training, a process that was neither formalized nor documented.

Carter Hasty testified that he is a journeyman electrician at KCS. He also has a leadership position with the local union for electricians; there are other crafts members at the diesel shop as well. Hasty stated that at the time of Waller's accident, a few of the senior employees, including Waller, had tool lockers right by the door to the parking lot. There is a paved walkway from the parking lot to the shop. Back then, there was no designated path for employees to use to get into the shop. Additionally, there was no prohibition against employees coming into or leaving work in their street shoes—this was something that was commonly done. According to Hasty, people were allowed to enter through various entry points in their street shoes.

Hasty further testified that besides the locker room, there were other places where people changed, such as the overhaul area and at the lockers underneath the ramps. "Way back" ago they had lockers in the middle of the shop and some men would change there. According to Hasty, fan housings were put "anywhere" in the shop they could set them. Whether a housing would be set on its side or in the V-formation was up to the employee who placed it.

15

Prior to Waller's accident, regarding the training they received to operate cranes, Hasty stated that they got on-the-job training and he recalls taking a course in 2004 or 2005 from Roger Ferron, who came down from Canada. KCS also trained them on the General Code of Operating Rules and KCS's Safety Rules. On cross-examination, Hasty clarified that the tool lockers were not a designated area for changing, nor was the overhaul area. On redirect, Hasty reiterated that there was no requirement that people had to use the locker room or that employees had to wear their PPE boots when they left. Instead, people walked through the shop area in their street shoes to change into their boots for their shift and changed out of their boots into their street shoes to leave once work was finished.

Ms. Wright stated that she didn't talk to Carl Shoemake, Koske, or Hall, or any other members from the crew working on Locomotive 2826. She also did not try to determine who had put the fan housing in its place, how long it had been there, whether there had been a job briefing prior to its placement, etc. at the time of the incident. According to Ms. Wright, "Just because [the fan housing] was tilted or not tilted, right, doesn't necessarily mean that a crane was involved[.] *As far as we were all concerned, there was no crane involvement*."

Roger Ferron testified for KCS. Ferron, a certified health and safety instructor in both Canada and the United States, stated that he has written many training programs, including ones for crane safety that are tailored to specific types of cranes. He identified the crane depicted in a photograph of the KCS diesel shop as an overhead or Gantry crane. Ferron stated that he provides training for KCS's Shreveport engineering and mechanical department employees and has done so since around 2000. He has included

16

crane safety training classes on a rotating schedule of every third year. This training includes lifting capacity, how to calculate a lift based on the weight and shape of the load, and selection and use of proper attachment equipment. Ferron explained to the jury that "rigging" is the use of attachments to connect the load to the crane to be safely lifted and moved. A load could be equipment or material, stuff in a barrel or crate or on a pallet, or heavy tools, etc.

Ferron testified that his training is in classroom format; he does a PowerPoint presentation, then together he and the trainees go through the different steps involved in a lift. At that time, the trainees take part in an exercise in which they perform calculations to determine how to safely hook up certain things. The final activity is a written test. Ferron noted that there is always a sign-in sheet and test involved in each training session, and all participants must "pass" the test. According to Ferron, the sign-in sheets and tests are turned over to "whoever is responsible for collecting it" at KCS. He does not keep them as they are not his—the presentations he prepares for employers become their property. The training he prepared for KCS specifically included training for the Gantry crane, which is a "one-person" operation.

Ferron also stated that the Crane Institute of America also did a three-day operator training course in Shreveport. Ferron took part as a participant in this program (to update his credentials). He testified that there were also KCS employees who took this training. He trained 100% of the employees in their engineering department at KCS's request. In 2003, he taught a class called "Crane and Sling Training" which he repeated in 2006 and 2009. He

thinks his last training at the Shreveport yard was the end of 2016 or the beginning of 2017.

Ferron agreed that loads must be properly blocked prior to being unhooked and unslung. He noted that management took the same training as the employees. Ferron further observed that under OSHA, there are special obligations for management. Specifically, management has the responsibility of documenting employee training and determining employee competence. Companies have to train, test, and certify employees who use cranes or lifts. Ferron stated that having job briefings is part of the process.

Justin Gorman testified that he has worked for KCS since 2013. He started as an equipment mechanic working in the diesel department, but since 2018 has worked in the engineering department. When he worked on locomotives, at the beginning of every shift they had a safety meeting and job briefing. Gorman stated that he went through the general rules and KCS safety training as well as the crane training, which included PPE. According to Gorman, whenever he put down a fan housing, it was in the V-formation because he felt that was the more stable position. Gorman testified that he was not a part of the crew that pulled the fan housing out of Locomotive 2826, and he did not place it near Waller's tool locker on September 11, 2017. On cross-examination, Gorman acknowledged that there is not a rule as to how a fan housing should be put down on the shop floor.

Both Hall and Koske testified in person for the defense. Hall's testimony related to a test he performed on the fan housing to determine how much weight or pressure it would take to tip it over when it was in the V-formation; he told the jury the fan housing tipped over when he applied body weight pressure to it. Koske testified that prior to Waller's accident, he was

unaware that employees were changing into and out of their PPE in work areas of the repair shop, which was the main reason he issued the director's circular preventing that after Waller's injury. He told the jury that Waller could have been cited for a disciplinary infraction after his accident for being in a work area without his proper PPE on, but no citation was issued.

As the above evidence shows, there is a rational basis which supports the jury's finding of negligence on the part of KCS. When the plaintiff rested, KCS moved for a directed verdict, which the trial court denied. The trial court's reasons were succinct and this Court surmises form part of what caused the jury to find KCS to be culpable in this matter.

> [There was] no evidence that Mr. Waller used the crane to place the housing where it was. In fact, no evidence of who used the crane to place it there, no documentation of it or anything as far as that [goes was ever given by KCS]. In connection with the requirement of the PPE, it seems to me, from all accounts, there was a requirement but it seemed to be very relaxed. People were changing into their…everyday clothes to leave work wherever it was convenient.

This assignment of error is meritless.

**(2) The trial court erred in modifying the jury's verdict and refusing to reduce the amount of damages awarded to Waller by the percentage of fault assessed to him by the jury.**

In this assignment of error, KCS challenges the negligence *per se* claim of Waller recognized by the trial court in its final judgment in its modification of the damage award when it did not reduce the damage award by the percentage of fault assessed to Waller by the jury based on its legally flawed determination that ASME B.30.2 § 2-3.3.3 is a safety statute within the meaning of 45 U.S.C. § 53. According to KCS, Waller's negligence *per se* claim can only be upheld if the facts and law support a negligence *per se* claim premised upon violation of this particular regulation. KCS urges that

19

there is neither legal nor factual support for the judgment in this case, which nullified the jury's allocation of fault between KCS and Waller and resulted in an award of monetary damages to Waller of 20% more than the jury determined as a factual matter was appropriate.

KCS also argues that the trial court's judgment modified the jury's verdict, which is an error of law separate and distinct from the trial court's determination that ASME B.30.2 § 2-3.3.3 was a safety statute within the intendment of 45 U.S.C. § 53. To the extent not resolved by a pretrial exception or summary judgment, the applicable law pertaining to all triable issues must be included in the jury instructions and interrogatories. The jury received no instruction on either negligence *per se* or the effect its application would have on the jury's allocation of fault.

The jury was given the task of determining whether KCS had violated ASME B.30.2 § 2-3.3.3, then instructed that violation of this regulation was only one of multiple grounds it could consider ***in determining KCS's negligence***. Thereafter, it was instructed on the principles of comparative negligence, but not regarding negligence *per se*, ***nor was the jury told that if it found that KCS had violated the "federal regulation" there would be any consequence other than facilitating a finding of negligence***. Thus, the jury was instructed in the law applicable to a case in which no negligence *per se* claim was presented. Accordingly, the jury returned its verdict, ***consistent with its instructions***, finding that KCS's negligence was due, in part, to a violation of ASME B.30.2 § 2-3.3.3, and assigning fault to both KCS and Waller for Waller's injuries.

According to KCS, absent some internal inconsistency in the verdict itself, it is legal error to modify or revise a jury's verdict when rendering

judgment on that verdict. Thus, the trial court's judgment (for this and other reasons) should be amended to reduce the damages award by at least 20% (as the next assignment of error is KCS's claim that this is too low for Waller's fault allocation) as per the jury's verdict.

On the other hand, Waller urges that by answering Special Question No. 2 on the verdict form, the jury found that KCS violated the mandatary crane regulations found in OSHA's B.30.2 and that this violation was a legal cause of Waller's injury. Waller asserts that, "consistent with the [attorneys'] agreement at the pretrial hearing, no one argued the ultimate legal significance of the jury's answers to special questions." Waller further contends that "[i]t was not until entry of judgment that KCS first claimed that the jury should have been so informed." According to Waller, "[i]rrespective of whether the court was correct in its legal application of § 53, it did not arbitrarily 'modify' the jury's findings."

The determination of whether OSHA regulations apply and whether OSHA is a safety statute under 45 U.S.C. § 53 are questions of law. However, it is unnecessary for this Court to determine whether the trial court erred in declaring that this OSHA regulation was a safety statute under 45 U.S.C. § 53. We find that the trial court erred in failing to give proper weight to the jury's verdict in this matter by making a substantive change to its verdict.

Trial testimony established that KCS's safety rules, in addition to applicable OSHA standards, required that personnel were to assure that loads were "resting securely." Safety Mgr. Casey Hall testified that he recreated the tip over, consulted the rules to uncover the root cause of the incident, and published a safety alert for distribution in response to the event. Hall agreed

21

that the diesel shop had blocks and cribbing available to secure components, yet none were used to secure the fan housing that fell on Waller. Several of Waller's co-workers testified that they received inadequate training on the applicable rules and noted that there was no requirement that they wear PPE on the shop floor at the time of Waller's injury. The jury could have concluded reasonably that a 3,000-lb. top-heavy object balanced on three points left unsecured in a work area regularly accessed by employees in street shoes directly adjacent to the tool lockers created a foreseeable hazard for such employees.

Under FELA, the jury could also have considered, *as evidence of negligence*, KCS's noncompliance with national standards of care, which would necessarily include the regulations applicable to KCS's management regarding crane operations and training (ASME B.30.2 § 2-3.3.3, the one included in the jury interrogatories). As noted by this Court in *Manchack v. Willamette Industries, Inc.*, 621 So. 2d 649, 652 (La. App. 2 Cir. 1993), *writ denied*, 629 So. 2d 1170 (La. 1993), violations of OSHA regulations are relevant to establishing the liability of a party. *See also*, *Gatlin v. Entergy Corp.*, 04-0034, p. 6 (La. App. 4 Cir. 5/4/05), 904 So. 2d 31, 35, *writ denied*, 05-1509 (La. 12/16/05), 917 So. 2d 1114. However, the reason that negligence per se should not have been a consideration in this case at all was because it was not properly *before the jury*.

It was KCS who brought the issue of negligence per se *before the trial court* in the form of a motion *in limine*, which sought to prohibit the plaintiff from bringing negligence per se and its potential bar on the plaintiff's comparative fault *before the jury*. The plaintiff never amended his petition to plead a cause of action alleging negligence *per se*, which is

actually separate and distinct from a FELA negligence claim, nor did he file a motion for summary judgment on this issue.

We note that KCS did file two motions for summary judgment, both of which were denied by the trial court; however, neither motion sought adjudication of whether violation of an OSHA regulation by KCS constituted negligence per se; instead, *inter alia*, the railroad asked the trial court to find that OSHA regulations related to overhead/gantry cranes were not applicable to this case.

Whether violation of a particular OSHA regulation constitutes negligence per se is a legal determination that is properly made on summary judgment or post-trial, but causation, when, as in the instant case, there are sufficient facts from which a reasonable jury could find that a regulatory violation contributed in whole or in part to a plaintiff's injury, is exclusively for the jury. *Rogers*, 352 U.S. at 504, 77 S. Ct. at 447; *Walden v. Illinois Central Gulf R.R.*, 975 F. 2d 361, 364-65 (7th Cir. 1992).

Under FELA, an employer's fault may consist of a breach of the duty of care or of a breach of some statutory duty. *Kernan v. Am. Dredging*, 355 U.S. 426, 432, 78 S. Ct. 394, 2 L. Ed. 2d 382 (1958). If a plaintiff proves a railroad violated a statutory provision enacted for the purpose of worker safety, he does not have to prove the elements of foreseeability, duty, or breach. 45 U.S.C. § 51; *Miller v. Union Pacific Railroad Co.*, 972 F. 3d 979 (8th Cir. 2020); *Edwards v. CSX Transportation, Inc.*, 821 F. 3d 758 (6th Cir. 2016).

During the hearing on the motions *in limine*, Waller and counsel for KCS "came to an understanding" that the issues of negligence per se and the fact that its finding by the jury could nullify any comparative fault on the

part of the plaintiff need not be brought up before the jury, but instead was simply something that would possibly come up after the jury's verdict. This was conveyed to the trial court by Waller's attorney, with no one raising the implications this could present should the jury return a verdict finding that KCS violated the OSHA regulation and that Waller was at fault in causing his injury. Thus, it was decided that the concept of negligence per se would not be conveyed to the jury, *who was to be the fact finder on all issues of causation in this matter*. Neither attorney mentioned negligence per se during the trial, and no jury instructions were issued by the trial judge on negligence per se or comparative fault.

The jury's verdict was rendered on February 5, 2024. The answers to the interrogatories by the jury were that both parties were at fault; KCS violated the federal regulation that sets forth requirements for management regarding crane operations, and this violation played a part, "no matter how small," in causing Waller's injuries; KCS was 80% at fault, and Waller was 20% at fault; and Waller was entitled to damages totaling $5,380,655.06.

La. C.C.P. art. 1916(A) provides in pertinent part, that "[a]fter a trial by jury, the court shall prepare and sign a judgment in accordance with the verdict of the jury[.]" Additionally, when there are special interrogatories, La. C.C.P. art. 1812(D) provides that the court shall enter judgment in conformity with the jury's answers to these special questions and according to applicable law. As noted by the court in *Brown v. Breaux Bridge Ventures, LLC*, 16-662, p. 6 (La. App. 3 Cir. 12/7/16), 207 So. 3d 1083, 1087, when the judgment of the district court does not correspond to the verdict of the jury, it is invalid on its face. La. C.C.P. art. 1813(C) provides that when the general verdict and the answers are harmonious, the court shall direct the

24

entry of the appropriate judgment upon the verdict and answers.  In a jury trial, the jury is responsible for finding facts and applying the law, as charged by the court, to the facts in arriving at a verdict.  There is no provision in Louisiana law for a jury's verdict to be considered "advisory," thereby allowing the trial court to interpret the jury's verdict or substitute its own findings of fact.  *Scott v. American Tobacco Co., Inc.*, 04-2095 (La. App. 4 Cir. 2/7/07), 949 So. 2d 1266, *writs denied*, 07-654, 07-0662 (La. 1/7/08), *cert. denied*, 553 U.S. 1094, 128 S. Ct. 2908, 171 L. Ed. 2d 842 (2008).

The factual determinations upon which the verdict and interrogatories were based were made by the factfinder in this case, which was the jury, not the trial judge.  The jury's verdict and its answers to the interrogatories were based on the applicable law as explained to them by the trial court in its instructions and are harmonious.  Negligence per se was taken out of the mix by the parties' attorneys at the motion *in limine* hearing as a result of their agreement to keep that legal doctrine from the jury.  Because negligence per se in this case is not simply a legal determination but a mixed question of fact and law requiring that factual determinations be made by an informed jury for its applicability, the trial court erred as a matter of law in failing to enter judgment that corresponded to the jury's verdict and interrogatories made in accordance with the instructions they were given.  Thus, we will amend the trial court's judgment by reducing the damages awarded to the plaintiff by the 20% comparative fault assessed to him by the jury.

**(3) The jury was manifestly erroneous in finding Waller only 20% at fault.**

KCS argues that under the factors set forth in *Watson v. State Farm Fire and Casualty Ins. Co.*, 469 So. 2d 967 (La. 1985), the jury's allocation of only 20% of the fault to Waller is manifestly erroneous.

Waller points out that the jury's discretion to apportion fault under FELA is immensely broad. He asserts that the jury's allocation of fault in this case is justified by proof of management's negligence and that of "unknown" employees, while his mistake was momentarily bracing himself against the fan housing which he had reason to believe was secured.

At the time of Waller's accident, Louisiana's comparative fault system of negligence allowed a plaintiff to recover if the defendant's negligence played a part in the plaintiff's injury and did not bar a plaintiff from recovering for his own contributory negligence as long as the plaintiff was not found to be 100% at fault for the accident.[6] La. C.C. art. 2323; *Watson*, *supra*. Under FELA, an employee's own contributory negligence does not bar his recovery, although it may diminish recovery in proportion to his fault. 45 U.S.C. § 53; *Sorrell*, 549 U.S. at 167, 127 S. Ct. 799; *Progressive Paloverde Ins. Co. v. Estate of Jenkins*, No. CV 19-12840, 2020 WL 5819995, at *2 (E.D. La. Sept. 30, 2020).

As noted above, an appellate court may not reverse findings of fact in a FELA case unless there is a complete absence of any probative facts to

---

[6] Beginning January 1, 2026, Louisiana is shifting to a modified comparative fault system. La. C.C. art. 2323 as amended by Acts 2025, No. 15, provides that a plaintiff who is found to be 51% or more at fault will be barred from any recovery. If a plaintiff is found to be less than 51% at fault, a comparative fault analysis will be performed, and that plaintiff's recovery will be reduced in proportion to his percentage of fault. This act mandates that if the factfinder is a jury, there must be an instruction that a finding of 51% or greater fault on the part of the plaintiff will result in no recovery.

support the fact finder's conclusions. *Richardson*, 31,736, p. 6, 731 So. 2d at 1021; *Broussard*, 29,769, p. 10, *citing, Dennis v. Denver & Rio Grande Western R.R. Co.*, 375 U.S. 208, 84 S. Ct. 291, 11 L. Ed. 2d 256 (1963). We cannot say that the jury's apportionment of fault is wholly unsupported by the testimony and other evidence presented at trial. Thus, we find no merit to this assignment of error.

### (4) The jury abused its discretion by awarding excessive general damages.

In support of this assignment of error, KCS cites jurisprudence involving "similar" awards. According to KCS, the reasonable range of general damages in such a case is $100,000 to $2 million. KCS urges this Court to find that the jury abused its discretion in awarding $3.94 million in general damages and to reduce that award to the highest reasonable amount, which it claims is no more than $750,000.[7]

Consistent with the two-step analysis set forth in *Barber Bros. Contracting Co., LLC v. Capitol City Produce Co., LLC*, 23-00788 (La. 12/19/24), 397 So. 3d 404, Waller compared the facts and circumstances of his case to the general damage awards in several cases involving similar facts. He urges this Court that the jury was well within its discretion to make the award it did in this case.

FELA allows recovery of damages for personal injuries to an employee of a railroad if the injuries resulted "in whole or in part from the negligence of any of the negligence of any of the [railroad's] officers,

---

[7] The jury awarded Waller: $600,000 for past physical pain and suffering; $800,000 for future physical pain and suffering; $400,000 for past mental anguish; $500,000 for future mental anguish; $200,000 for past disability; $500,000 for future disability; $60,000 for past disfigurement; $80,000 for future disfigurement; $350,000 for past loss of capacity for enjoyment of life; and $450,000 for future loss of capacity for enjoyment of life, for a total general damages award of $3.94 million.

27

agents, or employees." 45 U.S.C. § 51; *Armstrong v. Kansas City Southern Railway Co.*, 752 F. 2d 1110 (5th Cir. 1985). The proper measure of damages under FELA is inseparably connected with the right of action. Accordingly, it is an issue of substance that must be settled according to the general principles of law as applied by the federal courts. *Morgan*, 486 U.S. at 335, 108 S. Ct. 1837; *Chesapeake & Ohio Ry. Co. v. Kelly*, 241 U.S. 485, 491, 36 S. Ct. 630, 632, 60 L. Ed. 1117 (1916); *Harris*; *supra*; *Bodenheimer*, *supra*; *Shaw v. Texas and Pacific Ry. Co.*, 170 So. 2d 874 (La. App. 4 Cir. 1965), *writ denied*, 172 So. 2d 703 (La. 1965).

If the railroad's negligence played any part, no matter how small, in causing an employee's injury, then the railroad is liable for the resulting damages. *McBride, supra*; *Rogers*, *supra*; *Harris*, *supra*; *Williams v. City of New Orleans*, 04-0655 (La. App. 4 Cir. 1/19/05), 897 So. 2d 744, *writ denied*, 05-0416 (La. 4/22/04), 899 So. 2d 580; *E'Teif v. National R.R. Passenger Corp.*, 98-2503 (La. App. 4 Cir. 4/22/99), 733 So. 2d 155, *writ denied*, 99-1500 (La. 9/3/99), 747 So. 2d 548. As with other issues of fact, jury damage awards in FELA cases have been afforded great weight by the appellate courts of this state. *Id*.

We have looked at the particular facts and circumstances of the instant case as established by the lay and medical testimony and documentary evidence, as well as at prior awards in similar cases. *See, Pete v. Boland Marine & Mfg. Co., LLC*, 23-00170 (La. 10/20/23), 379 So. 3d 636; *Harris, supra*. We cannot say that the jury's award is an abuse of its vast discretion.

Waller's left foot was crushed where it joined at the ankle and heel when the 3000-lb. fan housing toppled onto it. He remained trapped under the large component until his cries were heard by other employees. He has

28

permanent damage to his left foot and internal damage to his large toe on that foot. Waller has had almost constant pain which cannot be successfully treated with injections, orthopedic devices, or surgery to lengthen his Achilles tendon.

Waller had a ten-day hospitalization for infection and wound care before he was discharged; he then had home health care services and outpatient wound treatment through December 2017. He participated in physical therapy for a year but efforts to "harden" his injuries were futile. Waller has required assistive walking devices since his injury and always will need them. Waller has developed hallux ridigus, which is severe arthritis of the big toe which worsens over time. Additionally, his heel is so sensitive that even the light touch of a bedsheet causes him severe pain. Due to arthritis and hypersensitivity, Waller is unable to walk or bear any substantial weight on his left leg.

Instability from his injuries caused Waller to have multiple falls while maneuvering on crutches. In one fall, he landed on his right hand, causing aggravation to a preexisting injury to his wrist. Waller had two surgeries with Dr. Cameron Atchison in Ft. Worth, Texas, one to repair torn cartilage (although full flexibility could not be restored) and the second to replace his central wrist joint with a prosthetic ball-and-socket device, which required bone grinding and resurfacing.

Waller continues to experience intense pain from his injuries. He experiences alternating hypersensitivity and numbness, constant swelling, and cannot wear a backed shoe. He has severe functional impairment with a poor prognosis and has been diagnosed with Chronic Regional Pain Syndrome, a condition that carries a pain profile that has been considered

worse than unprepared childbirth, cancer pain, kidney stones, or a crushed finger. Spinal injections intended to block the pain pathway from Waller's spine to his foot worked as only short-term partial relief. A spinal cord stimulator implanted at a later date with the purpose of interrupting pain transmission was unable to be tolerated by Waller, who had surgery for its removal in 2023.

In order to get some rest, Waller submerges his left leg in a bucket of ice water to "freeze" it, but he still only sleeps about two to three hours at a time. His treating physician has advised Waller that the "only obvious route to significant pain relief" is below the knee amputation, a drastic measure that must be considered by the plaintiff. Because of his right wrist injury, Waller now has to use his crutch on the "wrong" side, which increases the strain on his injured leg. This altered gait causes progressive pain in Waller's back, right hip, and right knee, which was the side previously unaffected by the accident.

Waller is unable to enjoy activities he previously took part in prior to his accident. Medical and lay testimony show that he can do nothing that is physically taxing, such as exercising, doing yard work, or traveling to visit his son or friends. Friends and family members also testified to how his accident had changed his perception of himself and how others saw him. It is fair to say that this accident and resulting injuries permanently altered Waller's life.

This assignment of error is without merit.

**(5) The jury erred in awarding an amount for future medical expenses that includes costs for procedures Waller has declined.**

KCS notes that the jury was confronted with high and low amounts for future medical expense estimates calculated by the parties' experts. The jury awarded Waller $396,104.34, the high option calculated by KCS's economic expert Chad Garland. This figure was based on the report of Waller's expert economist Jefferey Opp, whose calculations were based on expenses in a worksheet prepared by Victoria Powell, some of which represented procedures that had been previously declined by the plaintiff.

Thus, argues KCS, the jury's selection of the "high" option for future medical expenses is manifestly erroneous and must be reversed. KCS urges this Court to amend this amount to the "low" estimate provided by Mr. Garland, $239,106.57.

According to Waller, KCS chose not to call its own CPA, Chad Garland, as a witness, but introduced his numbers to the jury through a stipulation and visual exhibit. KCS's attorney told the jury that Garland's range for future medicals was between $239,016.00 and $396,134.00, depending on the jury's view of future medical inflation trends, yet now complains of the jury's factual determination.

However, we note that the jury also heard the testimony of Victoria Powell, the certified life planner who spoke at length about the cost of potential future medical expenses, as well as that of economist Jeffery Opp, who explained to the jury that even an award to Waller of medical expenses of $279,000, which was based on conservative future care and did not include the "speculative" procedures of which KCS complains, could cost "in today's dollars" from a low of $234,709 to a high of $416,958.

This assignment of error is without merit. The jury's award for future medical expenses was based on an amount which fell within the range of the

31

evidence presented to them, and this Court will not second-guess the jury's determination on this issue.

## CONCLUSION

For the reasons set forth above, we amend the trial court's judgment to reduce the damages awarded to the plaintiff, Michael Waller, by 20%, the percentage of fault allocated to him by the jury in its verdict. In all other respects, the judgment of the trial court is affirmed. Costs of this appeal are assessed equally to the plaintiff, Michael Waller, and the defendant, Kansas City Southern Railroad.

**AMENDED, and as AMENDED, AFFIRMED**.